TRINA A. HIGGINS, United States Attorney (#7349)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Vernon.Stejskal@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A Samsung Cellular Telephone more fully described in Attachment A, and currently located at 2329 Decker Lake Blvd, West Valley City, Utah 84119 | Case No. 2:23mj823-BCW<br><br>**AFFIDAVIT** |

I, Ryan Weir, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic device—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a sworn federal special agent for the United States Postal Service (USPS) Office of Inspector General (OIG), and have been so for approximately 2 years. Before being employed with the OIG, I was a special agent with Homeland Security Investigations (HSI) for approximately eleven years where I worked a significant number of federal narcotics

investigations. I have attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia and have twenty years of federal law enforcement experience. As part of my regular duties with the OIG, I investigate offenses relating to violations involving Title 18 USC 1708 and Title 21, United States Code, 841 and 846.

3. The applied-for warrant would authorize the forensic examination of the "Device" for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

4. On or about April 4, 2023, the OIG opened an investigation into alleged misconduct of City Carrier Bradley Neff after receiving an anonymous tip that Neff was bragging to unknown individuals of targeting and stealing parcels that he believed to contain narcotics being delivered to undeliverable addresses on his route. An undeliverable address might be a vacant home or a vacant lot or that is one number off of an actual business or residential address. Those who wish to obtain narcotics through the mail may use vacant home addresses to avoid detection by law enforcement and may retrieve those parcels later after they have been delivered.

5. On or about July 3, 2023, your affiant received an email from Mitzi Burton, Administrative Assistant, USPS stating a USPS customer in Tooele called in to report he had observed what he believed to be a drug transaction take place between a mail carrier and another individual. The customer stated the mail carrier was operating a USPS vehicle identified with the numbers 2212833.

6. On July 6, 2023, Postmaster Darlene Sanford, Tooele Post Office confirmed to your affiant that Neff always drives USPS Long Life Vehicle (LLV) #2212833.

7. On July 11, 2023, OIG Technical Operations Officer (TOO), installed a hidden camera inside of Neff's LLV #221833. The hidden camera was installed above one of the doors facing Neff opposite of where he sits and delivers mail while operating his LLV.

8. On or about August 24, 2023, your affiant discovered a piece of duct tape had been placed directly over the lens of the hidden camera inside of Neff's LLV. Even though it appears Neff had found the hidden camera Postmaster Sanford was never notified Neff had found the camera either by him or a supervisor over Neff.

9. On August 30, 2023, your affiant prepared a test parcel by placing a GPS tracking device and approximately seven (7) ounces of hemp flower inside a USPS parcel and placed a shipping label on the outside to have it delivered to a vacant house on Neff's mail route. Your affiant took the test parcel to the Tooele Post Office and handed it to Postmaster Sanford to have it placed in Neff's mail to be delivered on August 31, 2023. Agent Note: Hemp flower was used in the test parcel as it smells of and looks like marijuana. However, hemp flower contains such a small amount of THC (approximately .3%) making it legal to purchase and mail.

10. On August 31, 2023, your affiant and Special Agent (SA) Michael Riddle of the OIG conducted surveillance of Neff while he was delivering mail on his assigned route. Your affiant confirmed Neff had the aforementioned test parcel in his custody through GPS tracking, which showed the test parcel was in his custody while he was delivering mail.

11. As agents were conducting surveillance, SA Weir spoke with Postmaster Sanford over the phone who stated the Tooele Post Office smelt strongly of unburnt marijuana due to the test parcel being placed inside the safe in Sanford's office overnight. Sanford further stated other

employees at the post office were commenting on the strong odor of marijuana. Your affiants law enforcement vehicle also smelled of unburnt marijuana due to transporting the test piece from the OIG office to the Tooele Post Office on the 30th. Therefore, the test piece would have emitted a strong odor of marijuana inside of Neff's LLV, a small confined space.

12. At approximately 11:07 am, Neff delivered the test parcel containing the hemp flower to the vacant house located at 772 E. 500 N., Tooele, Utah. The house was clearly vacant, the lawn was dead, which was overtaken by overgrown weeds, the windows had a typed sign placed in the window by the front door warning against trespassing, there were no window coverings, no vehicles or other items in the yard or carport and there was a sign in the front yard indicating the house was for sale. It was clear this particular house had been vacant for an extended period of time and is one of the reasons your affiant chose this house for this operation.

13. After Neff delivered the parcel, your affiant parked across the street of the target residence in his law enforcement vehicle in a position where he could clearly view the porch of the target residence. Agents suspected that Neff, or another individual connected to him, may retrieve the test parcel later that day.

14. At approximately 12:19 pm your affiant observed a slender white male with dark hair retrieve the test parcel from the front porch of the target residence and walk back to and get into a red colored small passenger vehicle and drive east of the residence. Your affiant followed the red vehicle which pulled into the driveway of the residence located at 731 Bonneville Way. The residence at 731 Bonneville Way is a home on Neff's mail route and is on the street located just south of the target residence where Neff delivered the test parcel.

15. Your affiant approached the vehicle and observed the test parcel placed on the rear seat of the driver's side of the vehicle. Your affiant also observed two other occupants, both female, one in the front passenger seat, identified as Shelby Mayhew and the other in the rear passenger seat, identified as Danielle Mayhew. A short time after SA Weir approached the vehicle Danielle Mayhew voluntarily uttered to your affiant that the mail carrier told her he had delivered a parcel containing marijuana at the target residence.

16. Your affiant conducted a database query of the USPS Delivery Management System (DMS) which showed the USPS GPS handheld scanner assigned to Neff was just east of 731 Bonneville Way at 10:55 am and then was at the residence just west of 731 Bonneville Way at 11:04 am. Therefore, Neff would have spent approximately nine minutes at 731 Bonneville Way. It also shows that Neff was at 731 Bonneville Way before making the delivery of the test parcel to the target residence at approximately 11:07. This would have given time for Neff to speak with Mayhew about the target parcel thought to contain marijuana and even show her what it looked like or smelt like. DMS shows the amount of time that Neff took to make deliveries at the other residences on Bonneville Way to be approximately one minute or less.

17. A short time later that same day your affiant and SA Riddle and Assistant Special Agent in Charge (ASAC) Gregory Laffin found Neff while on his route. Your affiant activated his police lights in his issued government vehicle and conducted a stop of Neff while he was in his LLV. Neff admitted to telling Mayhew about the parcel but denied telling her to go retrieve it. Neff's cell phone was seized by your affiant and placed into OIG custody pending a search warrant.

**KNOWLEDGE BASED ON TRAINING AND EXPERIENCE**

18.     Based upon my training and experience, and conversations with, and training from, other officers and agents involved in narcotics investigations, I know the following:

19.     Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value.  These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes or stored in vehicles and on their electronic devices.

20.     Traffickers of controlled substances commonly maintain addresses, contact names and numbers and email addresses, order history, which reflect names, addresses, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization and it is common to find drug traffickers keeping records of said associates in cellular telephones and other electronic devices.  Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing illegal drug distribution business.

21.     Illegal drug traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product, or have photo or video security systems that record images from their homes or property.  These individuals usually maintain these photographs and recordings in their possession, at their premises, or at some other safe place, including their electronic devices.

22.     Drug dealers use cellular telephones and other electronic devices including computers as a tool or instrumentality in committing their criminal activity to include the purchase of narcotics on the Internet.  They use the electronic devices to maintain contact with

their suppliers, distributors, and customers.  Since cellular phone use became widespread, every drug dealer I have contacted has used one or more cellular telephones for his or her drug business.  Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes.  This data includes the following:

23. The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

24. Stored text messages are important evidence.  Agents can identify both drug associates and friends of the user who likely have helpful information about the user, his location, and his activities.

25. Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.  Pictures also identify associates likely to be members of the drug trafficking organization.  Also, digital photos often have "geocode" information embedded in them.  Geocode information is typically the longitude and latitude where the photo was taken.  Showing where the photo was taken can have evidentiary value.  This location information is

7

helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

26. Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

27. The Device is currently in storage at 2329 Decker Lake Blvd., West Valley City, Utah. In my training and experience, I know that the Device has been stored in a manner in which its' contents are, to the extent material to this investigation, in substantially the same state as it was when the Device first came into the possession of the OIG.

## TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. The "device" (Samsung cellular phone): A Samsung cellular phone is a wireless telephone or mobile telephone and is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address

8

  books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars.

 b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. The iPhone indicated in this affidavit contains a digital camera.

28. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, text messaging, address book, daily calendar of events, digital camera, email communications and Internet searches. Additionally, in my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

29.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   c.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

    Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

31. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

32.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Ryan Weir*
RYAN WEIR
Special Agent
USPS-OIG

Subscribed and sworn to before me on September 07, 2023

_____ *Brooke C. Wells*
Brooke C. Wells
United States Magistrate Judge

## ATTACHMENT A

## THE DEVICE TO BE SEARCHED

The property to be searched consists of the following:

a. A purple colored Samsung cellular phone seized from Bradley Neff

The item will be referred to as the "Device." The Device is currently located at 2329 Decker Lake Blvd., West Valley City, Utah.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

# THE INFORMATION TO BE SEIZED

1. All records on the Device described in Attachment A that relate to violations of Title 18 U.S.C. Sec. 371 and 1708 and Title 21 U.S.C. Sec. 841 and 846 that involve Bradley Neff, including:

   a. lists of customers, and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to the sources of narcotics (including names, addresses, phone numbers, websites or any other identifying information);

   d. any information recording Bradley NEFF's schedule or travel;

   e. all recordings both audio and visual indicating possession, storage, or trafficking of narcotics (to include EXIF data associated with visual recordings which can provide evidentiary dates and locations associated with the recordings);

   f. all communications to include but not limited to email, text or media messages, instant messaging, or messaging applications utilizing the Internet.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords;

14

3. Any other fruits or instrumentalities of the crimes of Conspiracy to Distribute narcotics and or of Conspiracy to Commit Mail Theft.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.